O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| I.A., *a minor by and through Guardian Ad Litem, Willnicka ReneePollarda*, et al., | ) ) ) | Case No. CV 20-06447 DDP (JPRx) |
| Plaintiff, | ) ) ) | **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) | |
| CITY OF REDONDO BEACH, a municipality, JOHN ANDERSON, | ) ) ) | [Dkt. 74] |
| Defendants. | ) ) | |

Presently before the court is Defendant John Anderson's Motion for Summary Judgment (Dkt. 74). Having considered the submissions of the parties and heard oral argument, the court denies the motion and adopts the following Order.

**I.   Background**

On July 26, 2018, Redondo Beach Police Department dispatch issued a radio call stating that a man on the Redondo Beach "Green Belt" was waving a gun, and had fired at someone who was running. (Declaration of Craig Smith, Ex. C at 68.)  The call identified the

///

suspect as tall, 120 pounds, in a navy blue shirt and black shorts. (Id.)

Defendant John Anderson ("Anderson" or "Defendant") was the supervisor of the Redondo Beach Police Department Directed Enforcement Unit, the primary mission of which was to respond to active shooter situations. (Declaration of Luke Fiedler, Ex. A at 58-59.) Anderson heard the "man with a gun" radio call and "self-dispatch[ed]" to the scene in his unmarked car, even though other units had already been dispatched to the scene. (Id. at 74-75.) Anderson was concerned because the greenbelt was often crowded with people, including joggers and children on bikes. (Smith Decl., Ex. E at 239.) Although Anderson made a wrong turn on the way to the scene, and had to make a u-turn, he was nevertheless the first officer to arrive. (Id. at 240, Fiedler Decl., Ex. A at 75-76.) The scene, however, was not the greenbelt, but rather a nearby residential area. (Fiedler Decl., Ex. A at 80; Smith Decl., Ex. E at 241.) Anderson did not see any pedestrians, but did see Sergio Acosta ("Acosta") walking out alone from a driveway. (Smith Decl., Ex. E at 241.)

When Anderson first saw Acosta, he was not sure Acosta was the suspect, and checked his in-car computer to verify the description of the suspect. (Smith Decl., Ex. E at 241.) From approximately 50 feet away, Anderson determined that Acosta was the suspect, and observed that he was very sweaty and "bug-eyed," as if he were under the influence of methamphetamine. (Smith Decl., Ex. E at 244-45). Acosta's left side was facing Anderson, and Acosta's right side was turned away from Anderson and away from the street. (Smith Decl., Ex. E at 23.) By the time Anderson stopped his

vehicle, he was approximately seven yards from Acosta. (Fiedler Decl., Ex. A at 203.) Anderson drew his weapon with his right hand, while simultaneously reaching across his own body with his left hand to put the car in park. (Fiedler Decl., Ex. A at 257.) Anderson was wearing a body camera, but did not activate it.[1] (Fiedler Decl., Ex. A at 77.)

At this point, witness accounts of what transpired next differ. Anderson testified that he opened his car door partway, wide enough for him to exit and to communicate with Acosta, but narrow enough to use for concealment. (Fiedler Decl., Ex. A at 260.) Anderson testified that he yelled, "Police," and that Acosta stopped walking and looked at Anderson, but did not otherwise respond. (Id. at 259, 270.) Acosta's empty hands were down around his belt, and his arms were held tight to his body. (Id. at 268.) Anderson then saw a gun tucked into Acosta's left armpit, with the barrel pointing backward.[2] (Id.) Anderson testified that he then yelled, "Drop the gun" three times, and that after the second command, Acosta responded, "I'm trying to protect my son." (Id. at 273-274.) According to Anderson, Acosta then moved his hand above the belt, toward the gun in his left armpit. (Id. at 279.) Anderson then fired six rounds through his car window at Acosta. (Id. at 291; Smith Decl., Ex. E at 249.) The gun fell from Acosta's armpit after the sixth shot. (Fiedler Decl., Ex. A at 291.)

---

[1] Anderson testified that turning the camera on could have taken up to five seconds. (Fiedler Decl., Ex. A at 222.)

[2] Investigators later determined that the gun was a replica Colt BB gun.

3

Acosta's girlfriend, Ginger Mungarro, was later interviewed by Redondo Beach Police.  She was standing one or two houses away from Acosta when Anderson arrived, and stated that Anderson "didn't tell [Acosta] to drop it or anything, no."  (Smith Decl., Ex. F at 9-10.)  She further stated that Acosta said, "All right, all right," and had his hands up, with the gun in hand.  (Id.)  Mungarro further stated that she "didn't think they would shoot that fast.")  (Id. at 9.)

Lauren Zboril was walking her dog when Acosta was shot.  (Fiedler Decl., Ex. B at 10-41.)  According to Zboril, she was between fifteen to thirty feet away from Acosta when she saw him collapse.  (Id. at 40, 81.)  Zboril heard no noise at all, including gunshots, and did not see a police vehicle drive up to Acosta.  (Id. at 77.)  She explicitly stated that she did not hear anyone give any command to Acosta.  (Id. at 84, 94.)

Carmen Navarro lived adjacent to the greenbelt, and ran into her kitchen to call 911 after seeing someone on the greenbelt holding a gun and hearing two gunshots.  (Fiedler Decl., Ex. C at 15.)  While still on the phone with 911, Navarro heard another, louder shot, followed by a split-second pause and then two more loud shots.  (Id. at 38.)  She did not hear any yelling prior to the loud shots.  (Id. at 48.)

Kayo Salako lived one house away from where Acosta was shot.  (Declaration of Kayo Salako; Fiedler Decl., Ex. A at 199.)[3]  Salako heard someone yell, "Stop, stop, stop," then "immediately" heard gunshots.  (Salako Decl.)  He went outside and saw an unmarked

---

[3] See also Supplemental Declaration of Luke Fiedler (Dkt. 91) (attaching notarized versions of declarations).

4

police vehicle with a shattered driver's side window and an officer standing "between the open door and the vehicle." (Id.)

John and Beverly Sullivan (collectively, "the Sullivans") lived one house away from where Acosta was shot, and two houses away from Salako. (Declaration of Beverly Sullivan; Declaration of John Sullivan). Both heard gunshots outside their home, but neither heard any police commands or any yelling prior to the shots. (Id.)

Four of Anderson's six shots struck Acosta. (Fiedler Decl., Ex. A at 296.) He was transported to a hospital and pronounced dead approximately an hour and a half after the shooting.

Plaintiffs, Acosta's parents and his minor child, I.A., brought this suit, alleging claims pursuant to 42 U.S.C. § 1983 for excessive force and interference with familial relationships. Defendant Anderson now seeks summary judgment on both claims.

## II. Legal Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). If the

moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel have an obligation to lay out their support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." Id.

///

**III. Discussion**

    A.    Fourth Amendment Excessive Force Claim

In Fourth Amendment excessive force cases, the question is whether a police officer's actions were objectively reasonable under the totality of the circumstances. Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010). Only information known to the officers at the time the conduct occurred is relevant. Cty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1546-47 (2017); Glenn v. Washington Cty., 673 F.3d 864, 873 n.8 (9th Cir. 2011). The officer's underlying intent and motivations, however, are not pertinent. Graham v. Connor, 490 U.S. 386, 396-97 (1989).

"[S]ummary judgment should be granted sparingly in excessive force cases." Gonzalez v. City of Anaheim, 747 F.3d 789, 795 (9th Cir. 2014) In deadly force cases, the decedent is, of course, not able to contradict the shooting officer's account of events. Accordingly, this Court must carefully examine all evidence in the record, including circumstantial evidence that might discredit the officer's story, "to determine whether the officer's story is internally consistent and consistent with other known facts." Id. (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)); Cruz v. City of Anaheim, 765 F.3d 1076, 1078 (9th Cir. 2014).

Whether a use of force was reasonable will depend on the facts of the particular case, including, but not limited to, (1) whether the suspect posed an immediate threat to anyone, (2) whether the suspect resisted or attempted to evade arrest, and (3) the severity of the crime at issue. Id. at 396. Of these, the most important factor is whether the suspect posed an immediate threat to anyone's safety. Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en

7

banc).  The use of deadly force is only reasonable if a suspect "poses a significant threat of death or serious physical injury to the officer or others."  Gonzalez, 747 F.3d at 793 (emphasis added) (internal quotation omitted).  Although "the mere fact that a suspect possesses a weapon does not justify deadly force," "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."  Hayes v. County of San Diego, 736 F.3d 1223, 1233 (9th Cir. 2013) (internal alteration omitted); Smith v. City of Hemet, 394 F.3d 689, 704 (9th Cir. 2005); see also Cruz v. City of Anaheim, 765 F.3d 1076, 1078 (9th Cir. 2014) ("It would be unquestionably reasonable for police to shoot a suspect . . . if he reaches for a gun in his waistband.")

    Somewhat curiously, Defendant's argument rests almost entirely upon Defendant Anderson's own version of events.  Certainly, if Acosta ignored Anderson's repeated warnings and then moved to threaten Anderson with a gun, then the use of deadly force may have been justified.  See, e.g., Hayes, 736 F.3d at 1233.  But the question is not whether a reasonable jury could find for Defendant.  The question, rather, is whether a rational trier of fact could, drawing all inferences in favor of Plaintiffs, find for Plaintiffs.  Anderson, 477 U.S. at 242.

    Here, a reasonable factfinder could well question Anderson's account of events, and thus the reasonableness of his use of deadly force.  For example, whether and how an officer warned a suspect can be important to a totality of the circumstances analysis.  See Deorle v. Rutherford, 272 F.3d 1272, 1283-84 (9th Cir. 2001); Gonzalez, 747 F.3d at 794; S.R. Nehad v. Browder, 929 F.3d 1125,

8

1137-38 (9th Cir. 2019). Here, at least three nearby witnesses stated that they did not hear Anderson give any commands or warnings at all.[4] Although Salako did hear someone yell, "Stop, stop, stop," his declaration does not corroborate Anderson's version of events, in which Anderson not only identified himself as a police officer, but also thrice commanded Acosta to "drop the gun." There is, therefore, a genuine dispute, not only as to what, if any, warnings Anderson may have given Acosta prior to shooting him, but as to the overall credibility of Anderson's account as well.

Even more curiously, aside from Anderson's own version of events, the only account of the incident that Defendant acknowledges at all is that of Acosta's girlfriend, Ginger Mungarro.[5] Mungarro's statements, however, directly conflict with Defendant Anderson's account, and alone are sufficient to create a genuine dispute of material fact. As an initial matter, as

---

[4] Whether those witness accounts create a genuine dispute of fact is a close question. Although the Sullivans were only one house away from the shooting, and did hear the gunshots, their declarations do not state where in the house they were, or whether they could or would have heard anything quieter than a gunshot out on the sidewalk next door. As for Zboril, the fact that she did not even hear gunshots from thirty feet away casts serious doubt upon the evidentiary value of her declaration. At this stage, however, all reasonable inferences must be drawn in Plaintiff's favor. Anderson 477 U.S. at 242.

[5] Mungarro's statements are drawn from an unsworn, recorded interview with investigating officers. Defendant describes those statements at length in his memorandum in support of the instant motion, and attaches a transcript of the Mungarro interview as an exhibit in support of his motion. Later, however, including at argument, Defendant objected to and questioned the admissibility of his own exhibit. The court deems any such objection waived, for purposes of summary judgment. Defendant may not introduce an exhibit, thus inducing Plaintiff to discuss it, and then later seek to preclude any consideration of that evidence on grounds that it was inadmissible all along.

9

Defendant himself acknowledges, Mungarro, like several of the other witnesses, did not hear Anderson say anything to Acosta. And, contrary to Anderson's testimony that Acosta said, "I'm trying to protect my son," Mungarro told police that Acosta said, "All right, all right."[6] Moreover, more fundamentally, and as Defendant also acknowledges, Mungarro told police that Acosta had his hands up when he was shot. This directly contradicts Anderson's testimony that Acosta had his hands down around his belt, and had moved his right hand only a few inches when Anderson first pulled the trigger.

More troublingly, Defendant's argument could be read to suggest that, because even Mungarro stated that Acosta was holding the gun (albeit, while his hands were up), Anderson's use of deadly force was reasonable as a matter of law.[7] Even putting aside the factual inconsistency between Mungarro's version of events and Defendant Anderson's, any such argument fails. It is well-established that "[t]he mere fact that a suspect possesses a weapon does not justify deadly force." Hayes, 736 F.3d at 1233; see also Nehad, 929 F.3d at 1134 ("That a person is armed does not end the reasonableness inquiry."). The relevant question is whether a

---

[6] Although this statement could support an inference that Anderson did say something, at this stage, as stated above, all inferences must be drawn in Plaintiffs' favor. Anderson, 477 U.S. at 242. It is not inconceivable that someone might respond, "All right, all right," unbidden, to an unidentified individual who emerged from an unmarked car holding a gun. And, even assuming that Anderson did say something to prompt Acosta to speak, there remains a genuine dispute as to what Anderson said.

[7] Indeed, at argument, Defendant suggested that, so long as Acosta possessed a gun and Anderson knew that Acosta had shot at someone earlier on the greenbelt, any other circumstances were "immaterial." That argument is simply incorrect, for the reasons stated herein.

suspect poses an immediate threat of harm at the time force is applied. <u>Andrews v. City of Henderson</u>, 35 F.4th 710, 717 (9th Cir. 2022) (quoting <u>Nehad</u>, 929 F.3d at 1136.)  If, as Mungarro stated, Acosta's hands were up when Anderson shot him, that would seriously undercut any claim that the use of deadly force was reasonable under the totality of the circumstances.  Any argument premised on Mungarro's statements is, therefore, self-defeating.

The law does not permit a grant of summary judgment under circumstances such as those here, where there are disputes about material facts. Defendant's Motion for Summary as to the excessive force claims is, therefore, denied.[8]

    B.    Fourteenth Amendment Interference with Familial Relationships Claim

Plaintiffs also bring a Fourteenth Amendment claim for interference with familial relationships. <u>See</u> <u>Wilkinson v. Torres</u>, 610 F.3d 546, 554 (9th Cir. 2010) ("[P]arents have a Fourteenth Amendment liberty interest in the companionship and society of their children.").  Official conduct violates the Fourteenth Amendment if it "shocks the conscience." <u>Id.</u>  "Police action

---

[8] Defendant also argues that, even if his use of deadly force was unconstitutional, he is entitled to qualified immunity. However, "when there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." <u>Morales v. Fry</u>, 873 F.3d 817, 824 (9th Cir. 2017) (citing commentary to Ninth Circuit Model Civil Jury Instruction 9.34 (2017); see also <u>Espinosa v. City & Cty. of San Francisco</u>, 598 F.3d 528, 532 (9th Cir. 2010).  Contrary to Defendant's suggestion, the crux of the matter here is not whether Anderson reasonably believed that the gun in Acosta's armpit was real.  Drawing all inferences in favor of Plaintiffs, Defendant cannot credibly contend that Anderson was not "on notice" that deadly force cannot be employed without warning on a person, armed or not, whose hands are in the air and whose only words to police were, "All right, all right."

11

sufficiently shocks the conscience . . . if it is taken with either (1) deliberate indifference or (2) a purpose to harm, unrelated to legitimate law enforcement objectives," depending on whether an officer has the opportunity to deliberate before acting. Nehad, 929 F.3d at 1139 (internal quotation marks and alteration omitted); A.D. v. California Highway Patrol, 712 F.3d 446, 453 (9th Cir. 2013).

Here, Defendant argues that there is no "evidence that 'actual deliberation' by Sergeant Anderson was practical, during the subject incident that could amount to 'deliberate indifference.'" (Motion at 18:22-24.)  This argument is not entirely clear to the court.  "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience.  On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." Wilkinson, 610 F.3d at 554.  Thus, if Anderson did not have time to deliberate, as Defendant appears to suggest, then Plaintiffs must show a purpose to harm, not deliberate indifference.

In any event, Plaintiffs' Fourteenth Amendment claim is not amenable to summary judgment for the same reasons that preclude summary judgment on the Fourth Amendment claim.  Defendant's argument is premised on Anderson's version of events, as to which there is a genuine dispute.  That dispute extends to the threshold question in the Fourteenth Amendment analysis: whether Anderson was forced to make a snap decision, or had time to deliberate while Acosta had his arms up in the air and was complying, or attempting

to comply, with any commands Anderson may have given. Defendant's Motion for Summary Judgment on Plaintiffs' Fourteenth Amendment claim is, therefore, denied.

**IV. Conclusion**

For the reasons stated above, Plaintiff's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

Dated: September 6, 2023

DEAN D. PREGERSON
United States District Judge

13